**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JESSICA KRUEGER,              )
                              )
          Plaintiff,          )
                              )        No. 23-cv-02493
     v.                       )
                              )        Judge Andrea R. Wood
RELIANCE STANDARD LIFE        )
INSURANCE COMPANY,            )
                              )
          Defendant.          )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jessica Krueger was working as a human resources employee for Cooper's

Hawk Intermediate Holdings, LLC ("Cooper's Hawk") when she began suffering from

symptoms of what would later be diagnosed as postural orthostatic tachycardia syndrome

("POTS"), and became unable to work. Krueger then applied for disability benefits under her

long-term disability insurance policy ("Policy") underwritten by Defendant Reliance Standard

Life Insurance Company ("Reliance"). Reliance, however, denied Krueger's claim because it

determined that her POTS was a pre-existing condition excluded from coverage. After Reliance

denied her administrative appeals, Krueger brought the present action pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), asking this

Court to order Reliance to pay her all the long-term disability benefits she believes that she is

owed under the Policy. Now, Krueger moves for judgment under Federal Rule of Civil

Procedure 52. (Dkt. No. 15.) For the reasons that follow, Krueger's motion is granted.

**LEGAL STANDARD**

Krueger asserts a single claim under ERISA § 502(a)(1)(B), which allows a beneficiary

of an employee benefit plan "to recover benefits due to [her] under the terms of [her] plan." 29

U.S.C. § 1132(a)(1)(B). An action under ERISA § 502(a)(1)(B) "is essentially a contract remedy under the terms of the plan." *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013) (internal quotation marks omitted). The parties here have agreed that Krueger's claim can be resolved under Rule 52.

A motion for judgment under Rule 52(a) "is essentially a trial on the papers." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 884 (7th Cir. 2015). The Seventh Circuit has recognized that the procedure "is well-suited to ERISA cases in which the court reviews a closed record." *Id.* In a proceeding pursuant to Rule 52(a), "[t]he court reviews the stipulated record, resolves any disputes of fact, and determines the outcome of the case." *Snapper v. Unum Life Ins. Co. of Am.*, 662 F. Supp. 3d 804, 812 (N.D. Ill. 2023) (internal quotation marks omitted). This Court must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).[1]

## FINDINGS OF FACT

The Court finds the following facts based on the administrative record[2] as well as the parties' respective submissions setting forth their proposed findings of fact.

Jessica Krueger was hired as a Senior Human Resources Manager by Cooper's Hawk on June 28, 2021. (Def.'s Resp. to Pl.'s Proposed Findings of Fact ("RPFF") ¶ 3, Dkt. No. 29.)[3] In that role, Krueger was tasked with a variety of human resources responsibilities such as hiring,

---

[1] Reliance's response brief also purports to serve as a cross-motion for judgment under Rule 52, which Krueger protests is inconsistent with the notion of a trial on the papers. In particular, Krueger contends that since she has the burden of proof, she is entitled to have the last word just as in an ordinary trial. As the Court views it, Krueger contends that Reliance's reply in support of its cross-motion is essentially an unauthorized sur-reply that should not be considered. The Court has considered all submissions before it and declines to address this relatively minor procedural quibble because it ultimately has no bearing on the disposition.

[2] The administrative record has been filed at Docket Number 41.

[3] At all relevant times, Krueger was a resident of Wheeling, Illinois. (RPFF ¶ 1.)

succession and workforce planning, developing performance standards and measurements of employee performance, and legal compliance. (*Id.* ¶ 4.) When hired, Krueger was 38 years old and had already compiled an extensive resume of work in human resources and sales positions. (RPFF ¶ 6; Administrative Record ("A.R.") at 43 (listing January 14, 1983, as Krueger's date of birth).) In addition to her salary of $125,000 per year, Cooper's Hawk provided Krueger benefits, including employer-sponsored long-term disability insurance coverage with coverage effective as of August 1, 2021. (RPFF ¶¶ 5, 7.)

Under the Policy underwritten by Reliance, Krueger was entitled to a benefit equal to 60% of covered monthly earnings after 90 days of Total Disability. (*Id.* ¶ 10.) The Policy defines "Totally Disabled" and "Total Disability" to mean, in relevant part, that "as a result of an Injury or Sickness . . . during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation." (RPFF ¶ 12; Def.'s Proposed Findings of Fact ("DFF") ¶ 1, Dkt. No. 29.[4]) "Regular Occupation" means "the occupation the Insured is routinely performing when Total Disability begins." (RPFF ¶ 13.) Further, the Policy states that a monthly benefit will be paid to an insured who "is Totally Disabled as the result of a Sickness or Injury covered by this Policy" if, among other things, she "submits satisfactory proof of Total Disability to us." (*Id.* ¶ 14.) The Policy also contains the following provision excluding pre-existing conditions from coverage:

> Benefits will not be paid for a Total Disability:
> (1) caused by; or
> (2) resulting from;
> a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured.

---

[4] Krueger did not file a response to Reliance's proposed findings of fact.

> "Pre-Existing Condition" means any Sickness or Injury for which the Insured was diagnosed or treated by a legally qualified Physician with consultation, advice or Treatment occurring during the three (3) months immediately prior to the Insured's effective date of insurance.

(*Id.* ¶ 15.)

Krueger's last day of work at Cooper's Hawk was December 31, 2021. (*Id.* ¶¶ 2–3.) Initially, Krueger stopped working because she was experiencing abdominal pain, severe diarrhea, and chronic migraines that, combined, caused her severe discomfort. (RPFF ¶ 19; A.R. at 160.) Then, on March 25, 2022, Krueger submitted her application for long-term disability benefits to Reliance, listing January 3, 2022, as her first date of disability. (RPFF ¶ 17; DFF ¶ 2.) In support of her claim to benefits, Krueger submitted a statement from her treating physician, Dr. Michele Puzio-Bell, certifying Krueger's disability. (RPFF ¶ 18; DFF ¶ 3.) Dr. Puzio-Bell's statement lists POTS as Krueger's primary diagnosis. (*Id.*) POTS "is an autonomic syndrome that is characterized by symptoms including lightheadedness, fatigue, palpitations, and increased upright heart rate with the maintenance of normal blood pressure." (A.R. at 621.) Symptoms may also include mental clouding, nausea, migraine headaches, and cognitive impairment. (*Id.* at 606.) The condition "is defined by an increase in the heart rate of [greater or equal to] 30 beats/minute . . . within ten minutes of standing, in the absence of orthostatic hypotension." (*Id.*) Consistent with that diagnosis, Dr. Puzio-Bell details Krueger's symptoms as including "visual changes, vertigo, headaches, profound weakness, [and] inability to stay upright." (RPFF ¶ 18; DFF ¶ 3.) She further states that it was "unknown" when Krueger would be able to return to work. (RPFF ¶ 18.)

Shortly after receiving her claim, Reliance sent Krueger a notice informing her that, because her date of disability was within her first 12 months of eligibility under the Policy, it would need to conduct a pre-existing condition investigation. (DFF ¶ 5.) Specifically, Reliance

would need to determine whether Krueger had received consultation, advice, or treatment for the symptoms identified in her benefits claim in the three months preceding the Policy's effective date, such that the pre-existing condition exclusion applied. (*Id.*) As part of its investigation, Reliance considered medical records from between May 4, 2021, and March 29, 2022. (RPFF ¶ 22.)

During the three-month "lookback" period preceding the Policy's effective date, Krueger visited Dr. Karyn Karlin, a neurologist, three times for treatment of her chronic migraines. (DFF ¶ 6.) Dr. Karlin's treatment notes reveal that Krueger had been suffering from migraines since at least September 2020. (RPFF ¶ 22; DFF ¶ 7.) Following a June 15, 2021, visit, Dr. Karlin assessed Krueger as suffering from "tachycardia—no clear cause" but noted "no syncope or evidence of POTS." (DFF ¶ 7; A.R. at 329.) She further noted that Krueger took Propranolol for her tachycardia. (DFF ¶ 7.) Reliance's review of Kreuger's medical records showed that a cardiologist had diagnosed her with inappropriate sinus tachycardia. (DFF ¶ 8; A.R. at 53.)

Shortly after her last day of work at Cooper's Hawk, Krueger visited with Dr. Fred Rosenberg, a gastroenterologist, on January 12, 2022, complaining of abdominal pain, diarrhea, and irritation in her colon. (RPFF ¶ 24.) About a month later, Krueger consulted with a second gastroenterologist, Dr. Omar Khan. (*Id.* ¶ 25.) On March 29, 2022, Krueger visited with a neurologist, Dr. Alexandru Barboi. (*Id.* ¶ 23.) Dr. Barboi's notes for that visit document that Krueger had experienced an increase in her migraines over the preceding months, along with "worse dizziness." (RPFF ¶ 23; A.R. at 280.) He further notes: "Not working since 12/2021: abdominal pain, diarrhea and frequent headaches. Then more dizziness described at times as vertigo or motion sensitivity, feels off balance. Has had a few episodes of fainting and also has lightheadedness." (A.R. at 281.) Dr. Barboi also documented Krueger as having "[t]achycardia

for the past 2 years, at times associated with chest pains. Was placed on propranolol but then it stopped working." (*Id.*)

On June 2, 2022, Reliance notified Krueger that it had denied her claim for long-term disability benefits. (RPFF ¶ 27.) As grounds for its denial, Reliance explained:

> On March 25, 2022, Dr. Puzio[-Bell] completed an Attending Physician's Statement. The form noted that you had symptoms of visual changes, vertigo, headaches, profound weakness and inability to stand up right since January 1, 2022. You were ultimately diagnosed with POTS. However, based off of your symptoms, you have been taking propranolol for the past two years related to your original diagnosis of inappropriate sinus tachycardia.

> Given that you have a history of tachycardia, and the medications associated with the condition, these align with the diagnosis of POTS and the medications used to treat this condition. Therefore, your condition is considered to be pre-existing.

> Our investigation has revealed that you received medical treatment, consultation, care of services, or took prescribed drug or medicine during the period (May 1, 2021, to August 1, 2021). Accordingly, your Sickness or Injury is considered to be Pre-existing and your claim for [long-term disability] benefits must be denied.

(DFF ¶ 9; A.R. at 135.) Krueger appealed Reliance's denial of her claim on November 22, 2022, arguing that she had not been diagnosed with POTS until after the three-month lookback period had expired and that POTS disabled her independent of her comorbid conditions. (RPFF ¶ 28; DFF ¶ 10; A.R. at 438.) To support her appeal, Krueger submitted additional medical records from after her initial claim along with witness statements. (RPFF ¶¶ 29, 32.)

The new records showed that Krueger had visited an electrophysiologist, Dr. Albert Lin, on May 13, 2022, about her POTS and inappropriate sinus tachycardia. (RPFF ¶¶ 29–30.) Dr. Lin reported impressions for inappropriate sinus tachycardia, POTS, and autonomic dysfunction. (A.R. at 563.) On September 23, 2022, Krueger had an appointment with Dr. Barboi's physician assistant, Isidora Kafkas. (RPFF ¶ 31.) Krueger told Kafkas that she initially stopped working due to "horrible abdominal pain, but in the weeks following her dizziness started and later

fatigue set in and became exhaustion. Looking at a screen lead [*sic*] to poor vision/clarity. Her dizziness with poor vision made work difficult." (A.R. at 564.) Moreover, Krueger stated that "[s]evere exhaustion and body weakness are most limiting for working currently. Brain fog impacts performance and making decisions, multi tasking now limited from this." (RPFF ¶ 31.) Kafkas noted that Kreuger "feels poorly from various dysautonomia symptoms which include fatigue, nausea, lightheadedness, brain fog and limb weakness and they limit her ability to work." (*Id.*)

Krueger also made several return visits to Dr. Karlin, during which it was noted that her headaches improved after Botox treatment. (RPFF ¶ 29; A.R. at 552–53.) When she visited on November 8, 2022, she told Dr. Karlin that she was having problems with dizziness and light-headedness, neither of which were associated with her migraines. (A.R. at 552.) Further, even with the improvements in her headaches, Krueger continued to experience dizziness and light-headedness and felt it "related to orthostatic position." (*Id.*) Dr. Karlin subsequently opined that, clinically, Krueger "provides history that seems orthostatic dizziness/light headedness is disabling and problematic causing limitation of work environment when up and down or at times prolonged seated and not having option to be supine." (*Id.* at 556.)

Included with Krueger's appeal were witness statements from her sister and her mother. (RPFF ¶ 32–33.) Krueger's sister observed a shocking deterioration in Krueger's condition between when the sister visited in October 2021 and again in February 2022. (A.R. at 571.) In February 2022, Krueger was "so exhausted she could barely move, had no appetite, and couldn't focus on watching a movie or TV show." (RPFF ¶ 32.) Krueger's sister also reported that she had seen Krueger suffer from intense dizziness and brain fog, and nearly pass out upon standing up. (*Id.*) Those symptoms made it impossible for Krueger to do anything more than lie on the

couch and caused her to miss a cousin's wedding, as well as a final opportunity to visit an uncle dying of pancreatic cancer. (*Id.*) Similar issues were described by Krueger's mother, who wrote about her surprise upon learning that Krueger was taking medical leave from work, as it stood in marked contrast to her long-held career ambitions. (*Id.* ¶ 33.)

For the appeal, Reliance retained Dr. Stuart Stauber, an internal medicine physician, to conduct an independent review of Kreuger's medical records. (RPFF ¶ 34; DFF ¶ 11.) Dr. Stauber's analysis was based solely on his review of Krueger's medical records and a single conversation with Dr. Karlin—he did not personally examine or even speak with Krueger. (RPFF ¶ 34.) He then issued an initial report concluding that Krueger's POTS-related complaints were "subjective in nature" and that "none of the claimant's diagnoses appear to result in a functional limitation, based on the available records." (RPFF ¶ 34; DFF ¶¶ 11–12.) Krueger was given an opportunity to review and respond to Dr. Stauber's report. (RPFF ¶ 35.) In her response, Krueger argues that Dr. Stauber failed to consider sufficiently her POTS diagnosis. (*Id.* ¶¶ 36, 39–42.)

Accompanying Krueger's response to Dr. Stauber's report were additional medical records related to Krueger's March 24, 2022, visit with Dr. Puzio-Bell. (RPFF ¶ 42.) Those records reveal that Krueger had undergone autonomic testing on March 17, 2022, with results "suggestive of POTS," and following her review of that study a week later, Dr. Puzio-Bell diagnosed Krueger with POTS. (*Id.* ¶¶ 20–21.) Moreover, Krueger had complained to Dr. Puzio-Bell of extreme fatigue even after doing minimal activity like showering or washing dishes that left her unable to do much for several hours afterwards. (*Id.*) Krueger also told Dr. Puzio-Bell that looking at a phone or computer screen triggered ocular pain, headaches, and vertigo. (*Id.*)

Along with the medical records, Krueger submitted medical literature on POTS. (*Id.* ¶ 36.) A 2021 article from the *Journal of Internal Medicine* discusses the large number of individuals with POTS who are unable to work as a result of the condition, including those around Krueger's age. (*Id.* ¶ 39.) Another article explains how POTS patients frequently go undiagnosed or undertreated by primary care physicians due to inadequate training. (*Id.* ¶ 40.) Likewise, a third article notes that POTS is frequently misdiagnosed but can be "functionally debilitating." (*Id.* ¶ 41.) Notably, that article lists inappropriate sinus tachycardia and migraine headaches as co-morbid conditions that can be diagnosed alongside POTS. (A.R. at 720.)

Finally, Krueger submitted her own declaration in which she describes the disabling POTS symptoms she experienced on a daily basis, such as severe abdominal pain, dizziness, clumsiness, disorganization, inability to remain upright for prolonged periods, fatigue, and unfocused vision. (RPFF ¶ 38; A.R. at 740–42.) The declaration also details discussions she had with Reliance's agents and her claim that they failed to understand and take seriously her POTS diagnosis. (RPFF ¶ 37.)

Following his review of Krueger's response, Dr. Stauber issued an addendum to his report on February 28, 2023, in which he acknowledges that Krueger had a confirmed POTS diagnosis. (RPFF ¶ 43; DFF ¶ 18.) Nonetheless, Dr. Stauber maintained his opinion that Krueger had not established that she suffered from a disabling condition. (*Id.*) Krueger then submitted additional records from Kafkas, Dr. Barboi's physician assistant. (RPFF ¶ 44.) In a note from a March 3, 2023 appointment, Kafkas observes as follows:

> Despite her [blood pressure] not being concerning [Krueger] is not functioning well on a daily basis. She is not able to work. Upon awakening she feels "awful" almost hungover like, nausea, upon standing she gets lightheaded, mild presyncope, and feels she sweats before awakening when still asleep. She gets out of bed slow given these symptoms, over 30 min at least but some days up to 2 hours given severity of symptoms. She often feels "ok" for the first 15 min she gets out of bed, but then

she feels lightheaded and presyncope when standing and then has to sit for hours to recover. She is not able to shower until after that time given this. Visual focus is poor in the mornings. Brain fog. Difficulty speaking/explaining. Fatigue is all day, but there are times of the day she is not able to stay awake. After showering she has to sit x 20 min to recover from that activity. She may be able to run an errand after lunch in the early afternoon, but somedays is too fatigued to even try leaving home. She has not had pain at all but in recent months has . . . noticed later in the day she feels coat hanger type pain which is very bothersome. Legs hurt from blood pooling and she often needs to elevate or to get some incomplete relief, despite using compression socks or leggings. Thermoregulatory symptoms. All these symptoms impact her cognition and brain fog and limit her ability to work reliably.

(RPFF ¶ 44.)

This new information led Dr. Stauber to issue a second addendum to his report on March 15, 2023, in which he concludes that the new records "describe[] in detail [Krueger's] subjective complaints but provide[] no positive objective findings supportive of her diagnoses or evidence of impairment." (RPFF ¶ 45; DFF ¶ 22; A.R. at 759.) Once again, Krueger attempted to sway his opinion, this time with an "Outpatient Dysautonomia Physical Therapy Evaluation." (RPFF ¶ 46; DFF ¶ 23.) That evaluation objectively measured Krueger as having reduced range of motion, reduced strength, decreased balance, and impaired posture. (RPFF ¶ 46.) The evaluation assessed Krueger as having an "intolerance to activity, weakness of core musculature, impaired posture, decreased balance on compliant surfaces and in tandem with eyes closed." (A.R. at 775.) Still, Dr. Stauber's third and final addendum indicates that his opinion remained the same. (RPFF ¶¶ 46–47; DFF ¶ 23–24.)

Based on its consideration of Krueger's medical records and Dr. Stauber's report, Reliance denied Krueger's claim for long-term disability benefits. (RPFF ¶ 48; DFF ¶ 25.) In its letter informing Krueger of its denial of her appeal, Reliance reaffirms its original conclusion that her POTS was a pre-existing condition. (DFF ¶ 26; A.R. at 150.) Further, Reliance states that "[e]ven in the absence of any pre-existing issues, the available medical records did not

reveal a Sickness or Injury resulting in limitations sufficient to preclude her from work" and therefore "did not meet the definition of Total Disability" under the Policy. (*Id.*) Having exhausted her administrative appeals, Krueger brought the present lawsuit against Reliance. (RPFF ¶ 49.)

## CONCLUSIONS OF LAW

A plan participant's challenge to a denial of benefits brought pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a deferential standard of review is appropriate." *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 836–37 (7th Cir. 2012) (internal quotation marks omitted). Here, the parties agree that the *de novo* standard governs.

Under the *de novo* standard, the district court is tasked with making an "independent **decision**, akin to a contract dispute," and "what happened before the plan administrator is irrelevant." *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020) (internal quotation marks omitted); *see also Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) ("[I]n [*de novo*] cases, the district courts are not **reviewing** anything; they are making an independent decision about the employee's entitlement to benefits.") Accordingly, "[t]he court must determine—based on all evidence in the record—whether the plaintiff qualifies for long term disability benefits under the terms of the Plan." *Ferrin v. Aetna Life Ins. Co.*, 336 F. Supp. 3d 910, 920 (N.D. Ill. 2018). The plaintiff bears the burden of proving that she is entitled to benefits by a preponderance of the evidence. *Halley v. Aetna Life Ins. Co.*, 141 F. Supp. 3d 855, 866 (N.D. Ill. 2015) (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005)). "In determining what [the plaintiff] must prove, the Court looks to the Plan's terms and,

to the extent they are consistent with ERISA, draws on federal common law and general principles of contract interpretation." *Slaughter v. Hartford Life & Accident Ins. Co.*, No. 22 CV 5787, 2024 WL 3251371, at *7 (N.D. Ill. July 1, 2024). And since "[t]he plaintiff is the one who is obligated to prove she is entitled to benefits . . . any gaps in the record cut against her claim." *Dorris*, 949 F.3d at 304.

Here, Reliance's primary basis for denying Krueger's claim for benefits was its determination that her POTS was a pre-existing condition excluded from coverage under the Policy. Alternatively, Reliance stated that even if POTS were not an excluded pre-existing condition, it still would have denied her benefits because she failed to prove that she met the Policy's definition of Total Disability. Krueger challenges both of these determinations.

## I.        Pre-Existing Condition

The Seventh Circuit has held that pre-existing condition exclusions in employee benefit plans are valid and enforceable. *Est. of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 403 (7th Cir. 2010). Whereas a plaintiff bears the burden of establishing her entitlement to benefits, the insurer has the burden of proving that a plaintiff is not entitled to benefits when it denies coverage based on a policy's exclusionary clause. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). As noted above, the Policy defines a pre-existing condition as "any Sickness or Injury for which the Insured was diagnosed or treated . . . with consultation, advice, or Treatment occurring during the three (3) months immediately prior to the Insured's effective date of insurance." (RPFF ¶ 15.) Reliance claims that Krueger had received treatment for symptoms associated with POTS during the Policy's three-month lookback period, thereby triggering the pre-existing condition exclusion.

According to Reliance, Krueger had been previously diagnosed with and received treatment for inappropriate sinus tachycardia, and tachycardia is a symptom of POTS. Likewise,

Krueger had a long history of migraine headaches, another symptom associated with POTS. Thus, Reliance asserts that even though Krueger was only diagnosed with POTS after the Policy went into effect, the treatment she received for her tachycardia and migraines during the three months prior to the Policy's effective date was, in fact, treatment for POTS.

Reliance highlights two Seventh Circuit decisions affirming an insurer's denial of benefits under a pre-existing condition exclusion based on pre-coverage treatment the plaintiff received for a condition that was not formally diagnosed until after the relevant policy went into effect. First, in *Estate of Blanco*, 606 F.3d 399, the claimant was taking medication for his extreme hypertension during the lookback period. *Id.* at 403. Then, while insured, the claimant suffered a heart attack that left him unable to return to work. *Id.* at 401. The Seventh Circuit held that the claimant's specific diagnoses, cardiomyopathy and congestive heart failure, "were certainly preexisting during the 'look back' period." *Id.* at 403. It further determined that the claimant's extremely high blood pressure and the treatment he received for it rendered him ineligible for benefits under the terms of the relevant pre-existing condition exclusion because his cardiomyopathy and congestive heart failure "were almost certainly due, at least in part, to [the plaintiff's] extreme hypertension." *Id.* at 403–05. Similarly, in *Bullwinkel v. New England Mutual Life Insurance Co.*, 18 F.3d 429 (7th Cir. 1994), the claimant had a breast lump that was detected before her coverage date; that lump was diagnosed as breast cancer while she was insured. On the record before it, the Seventh Circuit held that the only reasonable inference was that the lump discovered to be cancerous post-coverage was also cancerous when detected pre-coverage, and therefore the cancer was a pre-existing condition under the governing policy.[5] *Id.* at 432–33.

---

[5] The Seventh Circuit emphasized that the absence of any competing inferences was due to the specific facts before it and left open the possibility that the plaintiffs might have at least created a question of fact

On the other hand, Krueger relies on the Seventh Circuit's decision in *Pitcher v. Principal Mutual Life Insurance Co.*, 93 F.3d 407 (7th Cir. 1996). As in *Bullwinkel*, the claimant in *Pitcher* had received a post-policy diagnosis of breast cancer. *Pitcher*, 93 F.3d at 409. Also like in *Bullwinkel*, the claimant discovered the lump that was ultimately found to be cancerous prior to the effective date of her policy. *Pitcher*, 93 F.3d at 409. Unlike in *Bullwinkel*, however, the *Pitcher* claimant had a twenty-year history of a fibrocystic breast condition characterized by the presence of benign masses. *Pitcher*, 93 F.3d at 409 (internal quotation marks omitted). Still, the insurer determined that the claimant's breast cancer was an excluded pre-existing condition since the cancerous lump was discovered and a mammogram administered during the policy's lookback period. *Id.* at 411–12. The Seventh Circuit disagreed with the insurer that those events constituted "a 'treatment or service' ***for*** breast cancer" because the claimant "was being monitored for the longstanding fibrocystic breast condition and not cancer during the pre-coverage period" and that condition was "unrelated to cancer, even though it manifests itself in the ***same*** area of the body as breast cancer and takes on the form of cysts, masses, and formations of fibrous tissue." *Id.* at 412. The Seventh Circuit distinguished *Bullwinkel* by explaining that "the case before us . . . involves a combination of medical problems," whereas in *Bullwinkel*, the claimant "suffered from cancer ***and only cancer***." *Pitcher*, 93 F.3d at 415.

Other courts have subsequently elaborated on how *Bullwinkel* and *Pitcher* can be reconciled. One district court concluded that despite the seeming tension between the two cases,

> they can be read together to set forth a principle that although a plaintiff need not be definitively diagnosed with a condition during the treatment-free [*i.e.*, lookback] period there at least must have been some concern or suspicion at that time that the observed symptoms were caused by the particular condition in order for the patient to be considered as being treated or seen ***for*** the particular condition.

---

had they "submitted some kind of medical affidavit stating that a breast lump can be benign in one month, but cancerous two months later." *Bullwinkel*, 18 F.3d at 433.

*Goerig v. Phoenix Home Life Mut. Ins. Co.*, No. 97 C 1890, 1998 WL 801793, at *7 (N.D. Ill. Nov. 13, 1998). Another district court noted that a claimant is more akin to the one in *Pitcher* where there are "multiple possible diagnoses for the insured's condition." *Levin v. Sun Life Assurance Co. of Can.*, No. 06 C 2617, 2008 WL 834432, at *14 (N.D. Ill. Mar. 27, 2008). And the Third Circuit adopted and summarized *Pitcher*'s analytical framework as follows:

> [F]or purposes of what constitutes a pre-existing condition, it seems that a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms . . . . When a patient seeks advice for a sickness with a specific concern in mind (*e.g.*, . . . a breast lump, as in *Bullwinkel*) or when a physician recommends treatment with a specific concern in mind (*e.g.*, a "likely" case of multiple sclerosis . . .), it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested. But when the patient exhibits only non-specific symptoms and neither the patient nor the physician has a particular concern in mind, or when the patient turns out not to have a suspected disease, it is awkward at best to suggest that the patient sought or received treatment for the disease because there is no connection between the treatment or advice received and the sickness.

*Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 166 (3d Cir. 2002). The latter articulation "has become the standard for interpreting preexisting condition provisions." *Langdon v. Principal Life Ins. Co.*, No. 14-cv-6980, 2016 WL 4720025, at *9 (N.D. Ill. Sept. 9, 2016). Likewise, this Court finds the Third Circuit's analysis persuasive and consistent with the Policy's language[6] and it analyzes the facts here under that framework.

Applying *Lawson*'s framework to the present record, the Court concludes that Krueger's POTS was not an excluded pre-existing condition. Implicit in Reliance's argument to the contrary is that what Krueger's doctors originally believed to be separate conditions of migraine

---

[6] In *Lawson*, the policy defined a pre-existing condition as a "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician within the five (5) year period preceding that Covered Person's Effective Date of Coverage." *Lawson*, 301 F.3d at 161.

headaches and inappropriate sinus tachycardia were actually early manifestations of her POTS, rendering her POTS a pre-existing condition under the Policy's terms. But even just the fact of the misdiagnosis of those conditions would preclude a finding that the lookback-period treatments Krueger received were for POTS—the doctors were treating the conditions that they diagnosed, inappropriate sinus tachycardia and migraines. *See, e.g.*, *McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 628 (3d Cir. 2004) ("Seeking medical care for a symptom of a pre-existing condition can only serve as the basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or of the patient to treat or uncover the underlying condition which is causing the symptom."). Indeed, not only did the doctors not suspect that Krueger was afflicted with POTS, one of her primary treating physicians had expressly ruled it out, finding during the lookback period "no . . . evidence of POTS." (A.R. at 329.) Further reinforcing that Krueger's POTS was not an excludable pre-existing condition are the lookback period diagnoses themselves—that Krueger could plausibly be diagnosed with both chronic migraines and inappropriate sinus tachycardia simply shows that there were multiple possible diagnoses for her condition. *Cf. Levin*, 2008 WL 834432, at *14 ("There is no indication here that [the claimant's] symptoms could have been anything but dysphagia, whether or not it was diagnosed as such at the time.").

To the extent treatment for a misdiagnosed condition could be properly excluded under the Policy, the Court still would reject Reliance's attempt to deny Krueger benefits. In particular, the Court cannot conclude that Krueger's inappropriate sinus tachycardia and migraines were misdiagnosed POTS. Reliance provides little more than its say-so in support of its contention that Krueger's lookback period migraines and tachycardia were early manifestations of POTS. Particularly facile is Reliance's assertion that because POTS has the word tachycardia in its full

name (*i.e.*, postural orthostatic **tachycardia** syndrome) it necessarily follows that Krueger's lookback period tachycardia was POTS. With no medical evidence offered as support, Reliance's argument is semantic, not scientific.

When considering the actual medical evidence, there is no reason to believe that Krueger's inappropriate sinus tachycardia was a precursor to her POTS. First, "[t]here are many different types of tachycardia." *Tachycardia—Symptoms and Causes*, Mayo Clinic (Dec. 15, 2023), https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127. More specifically, inappropriate sinus tachycardia "is a clinical syndrome characterized by a persistently increased resting heart rate . . . and a further exaggerated increase with minimal physiologic stimuli." Muzaffar Ali et al., *Inappropriate sinus tachycardia: a review*, Rev. Cardiovascular Med. (Dec. 22, 2021), https://www.imrpress.com/journal/RCM/22/4/10.31083/j.rcm2204139/htm. By contrast, POTS involves an increased heart rate triggered by standing. (A.R. at 621.) The conditions, while similar, are not the same. Most importantly, the conditions can be comorbid. (*Id.* at 720.) Notably, none of Krueger's treating physicians ever stated that the earlier inappropriate sinus tachycardia diagnosis was a misdiagnosis of POTS or otherwise was related to the later-diagnosed POTS. And certain of her doctors noted both diagnoses. (*Id.* at 559.)

As to the migraine headaches, such headaches can be a symptom of POTS but also can be associated with any number of other conditions or exist by themselves. *See Bullwinkel*, 18 F.3d at 432 (distinguishing between "trivial and inconclusive symptoms . . . like a cough or a rash which might imply any of a variety of maladies" and symptoms that lead to the "inescapable conclusion" that the claimant had the condition that was ultimately diagnosed). Moreover, it is evident from the record that Krueger experienced improvement in her migraine headaches at the

same time that she continued to experience other POTS symptoms. Thus, Dr. Karlin documented after one visit that Krueger's dizziness and light-headedness were not associated with her migraines. (A.R. at 552.)

Viewing the record as a whole, Krueger had a history of both inappropriate sinus tachycardia and migraine headaches and received treatment or consultation regarding both during the Policy's three-month lookback period. Then, shortly after Krueger's last day of work in December 2021, she began visiting various doctors complaining of new symptoms that included gastrointestinal distress, dizziness, light-headedness, fatigue, and episodes of fainting. Ultimately, in March 2022, Krueger was diagnosed with POTS, a condition involving all of those symptoms. Subsequently, even as Krueger experienced relief for her migraines through Botox injections, she still continued to experience the other POTS symptoms at a disabling level. Krueger's witness statements also document a marked change in her health around the beginning of 2022. It is thus clear from the record that Krueger experienced a significant change in her health after the Policy went into effect, and there is agreement among her treating physicians that the change was due to POTS. Yet Reliance asks this Court to find that Krueger nonetheless had POTS prior to her employment at Cooper's Hawk because of diagnoses for conditions that have been shown to exist alongside POTS.

Reliance has the burden of proving that the Policy's pre-existing condition exclusion applies. And the Court finds that Reliance has failed to prove by a preponderance of the evidence that Krueger's tachycardia and migraines were early manifestations of POTS. For that reason alone, the Court can reject Reliance's invocation of the Policy's pre-existing condition exclusion. But even if Krueger's inappropriate sinus tachycardia and chronic migraines were misdiagnoses of what turned out to be POTS, the fact of misdiagnosis by itself would also preclude Reliance

from denying Krueger benefits under the Policy. Ultimately, however characterized, the treatment and consultation Krueger received during the lookback period for her diagnoses of inappropriate sinus tachycardia and chronic migraines do not establish that Krueger's POTS was an excludable pre-existing condition.

## II.     Total Disability

As an alternative reason for denying Krueger's long-term disability benefits claim, Reliance contends that Krueger failed to prove adequately that she met the Policy's criteria for Total Disability.[7] Specifically, Reliance faults Krueger's evidence of Total Disability for being based on her own or others' subjective reports of her pain and limitations and offering little objective proof of her functional limitations.

Stated succinctly, Reliance contends that Krueger cannot establish that she was Totally Disabled solely through subjective proof. It notes that the Seventh Circuit has recognized the distinction "between the amount of fatigue or pain an individual experiences, which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). Thus, "although a plan may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, a plan may deny benefits because a claimant has failed to properly document pain-induced functional limitations" through objective evidence. *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 485 (7th Cir. 2009) (citation omitted). Based on

---

[7] To be Totally Disabled, Krueger was required to show that her POTS prevented her from performing the material duties of her Regular Occupation. Both Reliance and Krueger accept that the analysis should relate to whether Krueger can perform the duties of the Senior Human Resources Manager position that she occupied prior her last day of work at Cooper's Hawk. The Court conducts its analysis accordingly.

this distinction, Reliance claims that it was entitled to insist that Krueger provide objective proof of her functional limitations.

Ultimately, "[h]ow courts treat objective and subjective evidence of functionality depends upon both the language of the ERISA plan and the level of review that the court must apply." *Cullett v. Kanawha Ins. Co.*, No. 12-cv-1501, 2014 WL 12567160, at *8 (C.D. Ill. Nov. 14, 2014). Reliance neglects to mention that the precedents upon which it relies involved plans that gave the administrator discretionary authority to determine eligibility for benefits and construe the plan's terms, such that the denial of benefits was reviewed under the arbitrary-and-capricious standard. *Majeski*, 590 F.3d at 481–83; *Williams*, 509 F.3d at 321. In requiring objective proof of the claimant's functional limitations, the insurer was interpreting the terms of the governing plan—namely, what constitutes satisfactory proof of disability. "When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms." *Morton v. Smith*, 91 F.3d 867, 871 n.1 (7th Cir. 1996). Thus, under arbitrary and capricious review, a district court reviews the insurer's interpretation deferentially, "which involves a more abstract inquiry—the construction of someone else's construction." *Id.*; *see also Williams*, 509 F.3d at 321–22 ("[T]his court will uphold the Plan's determination as long as . . . the decision is based on a reasonable explanation of relevant plan documents . . . ." (internal quotation marks omitted)). Given that context, one district court aptly explained:

> *Williams* does not stand for the proposition that claimants must produce objective evidence of reduced functionality in order to succeed on an ERISA benefits claim. Rather, *Williams* stands for the proposition that a plan reviewer does not act in an arbitrary or capricious manner when the plan policy does not prohibit the reviewer from giving objective evidence dispositive weight and the reviewer gives objective evidence dispositive weight.

*Cullett*, 2014 WL 12567160, at *7.

This Court is reviewing Reliance's denial of benefits *de novo*. Consequently, the Court "must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz*, 499 F.3d at 643. That means this Court must decide for itself what the Policy demands in terms of proof of Total Disability. However, looking to the Policy's terms provides little clarity. All that is required is "satisfactory proof of Total Disability" and that the proof be written. (RPFF ¶ 14; A.R. at 16, 19.) The Policy does not specify what it considers "satisfactory proof of Total Disability," nor does it distinguish between objective and subjective proof. Put another way, the Policy is ambiguous as to the nature of proof that will suffice. *See Diaz*, 499 F.3d at 644 ("Plan language may only be deemed ambiguous where it is subject to more than one reasonable interpretation."). And on *de novo* review, the Court will "construe all plan ambiguities in favor of the insured." *Santaella*, 123 F.3d at 461 (internal quotation marks omitted).

Construing "satisfactory proof of Total Disability" in Krueger's favor, the Court will not privilege objective proof over subjective proof because the Policy does not distinguish between the two. Certainly, the Court cannot reject Krueger's claim of Total Disability simply because her proof is predominantly or entirely subjective, especially given that her POTS symptoms are largely experienced subjectively. *See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 873 (4th Cir. 2011) ("As the Policy contained no provision precluding [the claimant] from relying on her subjective complaints as part of her evidence of disability, [the insurer] could not reasonably deny her claim because of such reliance."); *Cullett*, 2014 WL 12567160, at *8 ("[W]here the Court has not been directed to evidence that the Plan requires objective evidence rather than subjective evidence, and where the Court is required to consider all evidence before making an independent decision, it cannot grant summary judgment solely because Plaintiff's claim that she

lacks functionality is based on her own complaints rather than a battery of medical tests."); *Bayer v. Reliance Standard Life Ins. Co.*, No. 14-23934-CIV-LENARD/GOODMAN, 2016 WL 2622300, at *9 (S.D. Fla. Apr. 11, 2016) ("[W]here a claimant's symptoms are inherently subjective and the policy does not require a claimant to prove disability with objective medical evidence, an administrator cannot reasonably deny benefits based solely on a lack of objective medical evidence."). Under the Policy, the Court must fully and fairly consider all the proof of limitations and decide whether Krueger has established that she cannot perform the material duties of her job.

When viewing Krueger's evidence of her functional limitations without artificially discounting the evidence that could be deemed subjective, the Court concludes that Krueger has established that she is Totally Disabled under the Policy. To begin, Krueger has objective proof that she suffers from POTS in the form of autonomic testing suggestive of POTS and Dr. Puzio-Bell's official diagnosis. Reliance does not dispute that diagnosis. The question is whether her POTS symptoms are disabling. On this point, there is ample evidence documenting Krueger's POTS-related limitations.

After she stopped working, Krueger repeatedly sought care from at least six different physicians and one physician assistant regarding her POTS symptoms. *See Diaz*, 499 F.3d at 646 ("[T]he evidence of [the claimant's] repeated attempts to seek treatment for his condition supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling."). During those visits she consistently described how her symptoms caused her significant functional limitations. Those symptoms and limitations can reasonably be expected to affect detrimentally Krueger's ability to perform the significant cognitive demands of her role as Senior Human Resources Manager at Cooper's Hawk. *See Scanlon v. Life Ins. Co. of N. Am.*, 81

F.4th 672, 680 (7th Cir. 2023) ("[T]he district court must specifically address [the claimant's] ability to perform the cognitive aspects of his job with the limitations identified in the record."). Those duties include hiring, evaluating employee performance, and legal compliance. Similar to the Systems Analyst claimant in *Scanlon*, Krueger's role at Cooper's Hawk requires her to "confer with others, think critically, and make decisions in a timely and reliable manner" and be in front of a computer for extended periods of her workday; this Court's analysis must consider her limitations against those specific occupational demands. *Id.* at 678, 680. And the Court agrees that Krueger's lightheadedness, dizziness, brain fog, and fatigue would make it very difficult for her to manage the level of focus needed to think and communicate effectively in her job. That the symptoms are triggered by sitting and standing and by looking at screens further exacerbates those difficulties.

Based on Krueger's account of her symptoms, the Court agrees that her condition limits her ability to do her job at Cooper's Hawk. The Court finds nothing in the record that would cause it to doubt her credibility. None of Krueger's doctors have questioned her complaints or suggested that she is malingering or exaggerating her symptoms. Indeed, one of her primary treating physicians, Dr. Puzio-Bell, certified to Reliance that Krueger's condition was disabling. *Cf. Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 946 (D. Ariz. 2010) ("The treating physicians' subjective judgments are especially important in this case given the subjective nature of [Chronic Fatigue Syndrome], the fact that its symptoms are sporadical inasmuch as they fluctuate in frequency and severity, and the fact that it can exist even though physical examinations may be within normal limits."). Also, Krueger's mother and sister corroborated the disabling nature of Krueger's symptoms. Both attested to how Krueger's condition caused her to miss major life events, including a wedding and a visit with a dying

relative. The Court notes that the evidence suggests it would be highly out-of-character for Krueger to exaggerate her symptoms for the purpose of avoiding work, as her employment history depicts an ambitious employee who steadily rose through the ranks to a six-figure position at Cooper's Hawk. And Krueger's mother attested that taking medical leave and derailing her career ambitions was not a choice that Krueger would make unless absolutely necessary. Courts considering a claimant like Krueger have found that such a "history of professional success and dedication to her career tends to weigh against any inference that she would falsify or exaggerate her symptoms to avoid her career responsibilities." *Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 713 (M.D. Tenn. 2021).

In the face of the overwhelming weight of evidence of Krueger's disability, Reliance largely relies on the opinion of Dr. Stauber, an independent reviewing physician who never met with Krueger. The Court does not find Dr. Stauber's opinions persuasive. Rather than make any findings as to Krueger's functional capacity, his opinion rests on dismissing her evidence of functional limitations as subjective. *See Alvarado v. Aetna Life Ins. Co.*, No. 14 CV 4717, 2016 WL 4678305, at *7 (N.D. Ill. Sept. 6, 2016) (faulting the insurer for crediting an independent reviewing physician's opinion where it "appears to have unduly emphasized the lack of objective evidence of Plaintiff's disability, ignored strong evidence of her subjective pain, and reached a conclusion about her ability to perform highly demanding work without identified factual support"). Even after Krueger came forward with an objective dysautonomia physical therapy evaluation assessing Krueger with "intolerance to activity, weakness of core musculature, impaired posture, [and] decreased balance" (A.R. at 775), Dr. Stauber tersely dismissed it as not altering his original opinion. (*Id.* at 777–78.)

Before this Court, Reliance tries to write off that evaluation as also based on Krueger's subjective complaints. That is not accurate, as the evaluation contains a section with objective measurements of Krueger's diminished range of motion and muscle strength. In any case, even under an arbitrary-and-capricious standard, Reliance must "explain why, despite evidence to the contrary . . . it nevertheless finds [the claimant's] complaints of pain unreliable and why, if the complaints in fact are reliable, the pain [the claimant] is experiencing is not completely debilitating." *Leger v. Trib. Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 835 (7th Cir. 2009); *see also Krupp v. Liberty Life Assurance Co. of Bos.*, 936 F. Supp. 2d 908, 918 (N.D. Ill. 2013) ("Because none of [the insurer's] three consulting physicians considered how [the claimant's] pain might interfere with her ability to perform her job and thus failed to consider a relevant aspect of [the claimant's] medical condition, [the insurer's] reliance on their opinions was arbitrary."). Neither Dr. Stauber nor Reliance make any effort to explain why Krueger's complaints as to her limitations are unreliable.

To the extent Reliance tries to demonstrate that Krueger retained the ability to work, it points to objective findings unrelated to the symptoms of POTS. For example, Reliance discusses how the physician assistant Kafkas found that Krueger's blood pressure was not concerning (DFF ¶ 19), even though POTS is characterized by maintenance of normal blood pressure. And as discussed above, Reliance places substantial emphasis on Krueger's physical capabilities and barely addresses the cognitive limitations she experienced from symptoms like brain fog and light-headedness. *See Scanlon*, 81 F.4th at 678 ("We agree the evidence showed [the claimant's] capacity to perform these 'active physical tasks.' But those tasks are unrelated to his ability to sit at a computer for eight hours a day, one of the main physical requirements of his job.").

Finally, the Court is concerned that Reliance and Dr. Stauber may have failed to take Krueger's POTS seriously and seemed to be searching for a reason to deny her claim. Krueger submitted a declaration in which she reported that Reliance's agents did not understand POTS or take that diagnosis seriously. That claim has some support in the record. As this Court already discussed above, Reliance made no effort to disambiguate Krueger's earlier diagnosis of inappropriate sinus tachycardia from her subsequent POTS diagnosis. Moreover, in his original report, Dr. Stauber barely addressed Krueger's POTS even though it was the primary basis for her claim for disability. Then, Reliance continued to invite Krueger to submit additional medical records, only for Dr. Stauber to repeatedly dismiss them as subjective.

Now, Reliance claims that Krueger should have come forward with a functional capacity evaluation. Apparently, the outpatient physical therapy evaluation that she submitted was not good enough because it incorporated her subjective complaints. It is erroneous and disingenuous for Reliance to discredit objective evidence simply because it incorporates Krueger's subjective complaints. At no point either before this Court or at the administrative level has Reliance ever specifically communicated what satisfactory evidence would look like. Notably, Reliance had the ability under the Policy to require Krueger to submit to a personal interview or examination "to determine the existence of any Total Disability which is the basis for the claim." (A.R. at 16.) If its review of the record raised concerns about the extent of Krueger's limitations, Reliance could have availed itself of that procedure. Reliance's refusal to engage with Krueger's evidence or investigate her condition suggests that it was determined to deny her claim no matter what. *Cf. Holstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 775–76 (7th Cir. 2010) ("Over the course of the administrative appeals, [the insurer] invited additional evidence to establish disability, but when [the claimant] provided it, [the insurer] repeatedly found that the new evidence was not sufficient

26

under new standards or expectations that had not been communicated to [the claimant]. Such conduct frustrates fair claim resolution and is evidence of arbitrary and capricious behavior.").

In sum, the Court finds that Krueger has come forward with ample evidence demonstrating that her POTS symptoms prevent her from working. While the evidence is predominantly (though not entirely) subjective, there is no evidence in the record contradicting Krueger's contention that her symptoms are disabling. On the contrary, she has consistently sought treatment, the physicians she has visited have taken her condition and symptoms seriously, and her family has corroborated Krueger's claimed limitations. All Reliance does to counter that uncontradicted evidence is to insist on an objective-proof requirement that finds no support in the Policy language. This Court is satisfied from its independent review of the record evidence that Krueger is Totally Disabled under the Policy and therefore it will enter judgment in her favor.[8]

### III.    Prejudgment Interest and Attorneys' Fees

Having concluded that Krueger is entitled to judgment in her favor, the Court turns to her request for prejudgment interest and attorneys' fees. There is a "presumption in favor of prejudgment interest awards" for ERISA cases. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) (internal quotation marks omitted). "Absent special circumstances, compound interest is the norm in federal matters." *Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198, 1124 (N.D. Ill. 2014). Further, ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.

---

[8] There appears to be a dispute as to the exact amount of monthly benefits to which Krueger is entitled. Krueger claims she is entitled to a monthly benefit of $6,250 but Reliance suggests that figure could potentially be reduced if she has received "Other Income Benefits." (RPFF ¶ 16.) Thus, the Court cannot proceed with entering judgment until it receives further clarification as to the proper amount of the award.

§ 1132(g)(1). In determining the propriety of an award of attorneys' fees under ERISA, the Court must ask "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 506 (7th Cir. 2011) (internal quotation marks omitted).

Because Reliance believed questions regarding prejudgment interest and attorneys' fees were premature, it did not substantively brief either issue. For that reason, the Court will reserve its determination of those matters and provide the parties an opportunity to brief those issues. Nonetheless, the Court notes its preliminary inclination to authorize both awards. As should be evident from its above analysis, the Court finds many of Reliance's arguments for denying Krueger's benefits so weak as to call into question the good faith of its litigation position. To the extent Reliance is inclined to proceed with motion practice over the propriety of prejudgment interest and attorneys' fees, it should be prepared to discuss, at minimum: (1) its failure to support with actual medical evidence its claim that Krueger's inappropriate sinus tachycardia and migraine headaches were precursors to her POTS diagnosis, and (2) its failure to acknowledge that the cases it cited for the supposed requirement of objective proof of disability were decided on arbitrary-and-capricious review or explain how those cases were nonetheless applicable to this Court's *de novo* review.

## CONCLUSION

For the foregoing reasons, Krueger's motion for judgment (Dkt. No. 15) is granted. The Court will enter judgment ordering Reliance to pay Krueger the accrued long-term disability benefits to which she is entitled under the Policy from April 3, 2022 to the present. The parties are directed to meet and confer regarding the total amount of the award, as well as the propriety of prejudgment interest and attorneys' fees, and submit a proposed judgment order to the Court

by March 17, 2025. If the parties cannot come to an agreement, by March 17, 2025, the parties

shall file a joint status report stating their respective positions.

ENTERED:

Dated:  March 10, 2025

_____
Andrea R. Wood
United States District Judge